## BROWNLEE et al. v. MUTUAL BEN. HEALTH & ACCIDENT ASS'N.*

Circuit Court of Appeals, Ninth Circuit.
November 5, 1928.

No. 5481.

---

*Rehearing denied January 14, 1929.

Rudkin, Circuit Judge, dissenting.

Ernest Cole, of Portland, Or., for appellants.

Wallace McCamant, Ralph H. King, and McCamant & Thompson, all of Portland, Or., for appellee.

Before RUDKIN and DIETRICH, Circuit Judges, and NORCROSS, District Judge.

NORCROSS, District Judge. This is an action by the beneficiaries of an accident insurance policy issued by appellee to Leslie J. Brownlee, the insured. The policy by its terms expired at 12 o'clock noon January 1, 1927. It contained the following provision:

"If the insured shall, through accidental means, sustain bodily injuries * * * which shall independently and exclusively of disease and all other causes, immediately, continuously and wholly disable the insured from the date of the accident and result in any of the. following specific losses within thirteen weeks, the Association will pay— For loss of life $5,000.00. * * *"

Issue was joined on the following allegation in the complaint:

"That on the first day of January, 1927, and prior to 12 o'clock noon of said date and while said policy was in full force and effect, and while the said insured, Leslie J. Brownlee, was on an outing and pleasure trip on Mount Hood, situated in the County of Hood River, State of Oregon, the said Leslie J. Brownlee received and sustained bodily injuries effected through external, violent and accidental means, which said means alone caused his death prior to January 20, 1927."

At the conclusion of the testimony the

District Court sustained appellee's motion for a directed verdict, and this appeal is prosecuted from a judgment entered thereon.

The evidence established the fact that on the morning of January 1, 1927, the insured, in company with one Al Feyerabend, started to climb to the summit of Mt. Hood. Some time in the forenoon, because of the existence and severity of a snowstorm, the insured decided to give up the attempt and to return down the mountain. This was the last ever seen of him, alive or dead. Feyerabend continued the ascent for a time; then he also gave up and returned. Other portions of the evidence will be considered in connection with the legal questions presented on the record.

In sustaining the motion for a directed verdict, the court, after commenting on certain authorities, said:

"Now in this case we may assume that these boys separated at eleven o'clock, and that the weather was all that your witnesses claim, and that the conditions were exactly as they have described them. What is there in the case whereby we can say, or whereby there is a presumption that death occurred at twelve o'clock, or five minutes before twelve, or five minutes after twelve, or at one o'clock, or at two o'clock, and what is there in the case whereby a presumption can be raised that he died at any particular place upon the side of that mountain? Now that matter, I think, would be left to the guess of the jury. The evidence in this case might be sufficient to raise a presumption that the death of deceased was caused by reason of the conditions as they existed at Mt. Hood, January 1, 1927, coupled with the fact that a diligent search has been made for him, and that he has never been found, and the length of time that has transpired since January 1st. All these facts taken together might at this time raise a presumption that death had occurred, but that is as far as it will go. To say that that presumption would give rise to another presumption that he died at a particular time, or particular place, cannot be supported by the authorities. The Supreme Court of this state has decided a number of cases very similar to this, and where the question for consideration was the cause of death, and has held that where that matter is left to speculation, or to the guess of the jury, a verdict should be instructed."

It is contended by counsel for appellee that the judgment must be sustained because:

"Assuming that insured is dead, the proof leaves the manner of his death wholly in the realm of speculation. Based on conjecture his death may be explained in various ways, among which are the following: (1) That insured fell and sustained bodily injuries which resulted in his death; (2) that insured became lost, and having exhausted his food supply, starved to death; (3) that insured, having become tired and exhausted, stopped to rest and subsequently froze to death; or (4) that insured, because of the physical strain to which he had been subjected, died of natural causes."

■ If, as contended, there is no evidence in the record from which the jury may do other than speculate or guess as to the cause of death, then the judgment should be affirmed. Reading Co. v. Boyer (C. C. A. 3d) 6 F.(2d) 185; Philadelphia & R. Ry. Co. v. Cannon (C. C. A. 3d) 296 F. 302; Spain v. Oregon-Washington R. & N. Co., 78 Or. 355, 153 P. 470, Ann. Cas. 1917E, 1104; Medsker v. Portland R., L. & P. Co., 81 Or. 63, 158 P. 272.

If, however, there is evidence submitted from which the jury would be warranted in eliminating from consideration the second, third, and fourth possible causes of death above enumerated, then the case was one for the jury, and it was error to direct a verdict.

It is contended by counsel for appellant that if the deceased died from freezing, such cause would be an accident within the terms of the policy; but that question we think unnecessary to consider, otherwise than in reference to an immediate cause of death preceded by some other accident.

In the case of Spain v. Oregon-Washington R. & N. Co., cited supra, the court said:

"There is no evidence which has a tendency to show from which of these causes the subsequent aggravated condition arose. * * * When the evidence leaves the case in such a situation that the jury will be required to speculate and guess which of several possible causes occasioned the injury, that part of the case should be withdrawn from their consideration. Armstrong v. Town of Cosmopolis, 32 Wash. 110 (72 P. 1038)."

■ If the evidence in this case stopped at the point where and when the insured separated from Feyerabend, then it must be conceded that, if his death be assumed, the cause thereof would be left entirely to speculation. The evidence, however, does not stop at this point. The day following the disappearance of the insured, an organized search of the region where he was most likely to be found was instituted. Several parties were engaged in this search, and it continued for a week; "the searchers worked in different parties according to assignment." In the following

summer, after much of the snow had disappeared from the lower parts of the mountain, the search was resumed, without success. This we think was some evidence to go to the jury in a process of elimination of the various speculative ways in which death might have occurred. There was evidence that in the region in which the insured was last seen there were crevasses into which he could have fallen, and not be able to extricate himself, or ever be found.

The following excerpts from the testimony appear in the transcript:

The witness Al Feyerabend testified:

"In ascending the mountain there is no trail, but there is a general route used by climbers." "They selected a course probably half way between White River Canyon and Zigzag Canyon—Zigzag Glacier; they had no way of following a direct line; there was a space probably three-fourths of a mile in width between the two dangerous sections of the mountain—that is, Palmer Glacier is one dangerous section, which is to the extreme right, and Zigzag Glacier is on the extreme left; that they had probably three-fourths of a mile, or perhaps more, space between the two, so it really didn't matter as to the exact course which they pursued, but due to the storm they could not see very far and their direction was selected in two ways—they would keep going up hill and would follow from one dark rock to another, because on a steep slope the upper side of the rock is bridged over with snow and the bottom side as a rule is left bare; that they would follow from one rock to another, until they got to a place which, no doubt, was White River Canyon; that they could not see anything nor get the general lay of any place which they could recognize, but they could see the edge of the canyon, and beyond that there was a deep blue, which would signify quite a depth or quite a vast space, and by this they thought they knew approximately where they were, and they continued up along the edge of this canyon, keeping far enough away so that they would not be apt to fall into it, until they came to quite a high rise of ground they thought Triangle Moraine, which is probably the highest point along the south edge of White River Glacier, and sticks up as kind of a knoll in a direct line east and west with Crater Rock, and that if they would drop over toward the left, they would be in the swale that would lead them into the crater and from there the climb would consist merely following around Crater Rock, and there would be no trouble to get to the top; that they went around this rise thinking they were heading in the right direction, and continued for quite a while, but did not seem to get into the swale, and they became discouraged and used a compass line running due north, and were traveling in that direction when Leslie Brownlee decided he would go back; Leslie asked witness if the course was south and witness told him 'Yes,' that the south course would take him out to the highway; that at that time it was very stormy; that the higher up in the mountain the worse the storm became; that you could not see any distance; that you could not see anything in front of you because there were no dark objects up in that altitude; the down side of the rocks was blown with kind of an ice formation, which looks like a bunch of bananas hanging on all the rocks which projected."

Describing his experience on his downward course, after giving up the attempt to reach the summit, the witness Feyerabend testified:

"That in returning he was badly confused once; when he started down he was using the wind, keeping the wind on his right cheek, but he became quite confused after he had gone quite a distance, because the wind seemed to come from all directions, so he started following a down hill course and continued that course until he came to a place where it seemed to be more or less level, where he thought he saw timber, but that proved to be a mirage; it was not timber; it was nothing. That when he reached a lower altitude something caused the clouds to whip up, and he located himself; that he realized he was too far west and started to swing over to the east. He was high enough up on the mountain so that when he swung to the east he did not have to cross any large canyons. That the weather continued practically the same in his descent of the mountain until he reached a lower altitude around about 7,000 feet. He thinks it probably cleared at that altitude. That when he located himself, he pursued a direction heading for the ridge that Timber Line Cabin was on; he was quite a ways to the west from where he and Brownlee had started; he had veered over quite a ways from the path he had taken going up; that he wore his crampons all the time until he located himself, at which time he changed to snowshoes. The change was made a ways above timber line. He had been out such a length of time that he was not able to see the ground directly in front of him, and could not tell when he took a step whether the ground was level or irregular. The only objects which could be seen on the

whole climb were dark objects like the dark surfaces of rocks, and the rest of it was all a kind of a glare. You could not tell where the sky and ground left off, or whether the ground was level. That he got into only one small canyon, which was about ten or twelve feet deep. He had been walking, carrying his ice ax lashed to his wrist, so in the event he slipped into a canyon or started to fall, he could stick the ax in as he was falling. That he slipped into one small canyon before he saw it, and as he fell, he pushed in his ice ax, which held him at the end of the thong. He was quite careful in letting himself down but there were only about three feet below him to the bottom of the canyon."

Edward Phillips testified that his business was carpenter and mountain guide, and was familiar with the territory on Mt. Hood. "White River Canyon contains White River Glacier and the sides of the canyon are very steep, precipitous, especially in the winter time when the snow has drifted in and filled with cornices and combings; that White River Glacier is very rough and ragged, in the summer time at least it is lined with crevasses, big cracks, humps and hollows; these may or may not be bridged over by snow in the winter time; to the left or west of Crater Rock lies the head of Zigzag and Reid Glaciers; these latter likewise are lined with crevasses; as we get over towards Mississippi Head we come to canyons leading into Big Zigzag; Big Zigzag river heads directly below Mississippi Head, and there are three or four large canyons, deep and precipitous sides around Mississippi Head and below it; at any place on the face of the mountain or any place along the canyon, cornices form by drifting action of the snow being blown by the wind; these vary in size and height and in danger; likewise are wind crevasses formed in the snow, sometimes as much as fifty or sixty feet deep, with sides almost if not quite precipitous. Both Reid and Zigzag Glaciers contain quite a few crevasses; the climbing line below Crater Rock is safe if a person confines himself to a narrow path, but if they drift to either side of that they are in danger; crevasses at any point on the mountain catch the snow more or less in the winter time, and at times are filled solid with snow and at other times will be just a light bridge, but the wind and snow crevasses are changing all the time and are formed and reformed each winter; there are always crevasses at all times in any glacier and were up there, and during storms they either fill up or bridge over, and the ice cornices form at the lip of a crevasse or top of a crevasse;

the ice cornice is not deep, but is formed by drifting snow and freezing ice, which forms a shelf from either side and meet at the top of a crevasse which may be entirely concealed and under it would be a cavity, and that these crevasses vary in depth, the usual average is fifty, sixty and seventy feet; there is always snow and ice below Crater Rock as there is a glacier field in there. That during his three day search for Leslie Brownlee (witness) was pretty well over a good portion of the south side of the mountain above timber line; that a snow crevasse is an opening in the snow, and that he did not remember seeing any crevasses in the ice, but that there are crevasses in glaciers all the time, and that the snow fills them up at times, which may form a hard crossing, and might be soft snow not melted, as he had one experience with one covered over with soft snow and fell in, and that he might walk over one with perfect safety and not know it, but that gravity pulls the snow down and causes it to break in fissures and crevasses, and that he remembered seeing some of these places up the steepest part of Crater Rock, but did not see any on Zigzag Glacier; saw some fine crevasses, walls that led down into White River Glacier, or just dropped off like eaves of a house down into space for one or two hundred feet down; that is on the top of Triangle Moraine; that the glacier looked smooth because the snow had drifted and fallen on it, and that (witness) could not see any crevasses if they were there, but that the bridges formed over the crevasses are thin and pretty frail until freezing takes place, and that if you happened to get on a wide crevasse where it had bridged over, you might go through and you might not, and is a dangerous thing to walk over and you cannot always tell where they are at."

The witness George Calverly testified that: "He was familiar with Mt. Hood and the conditions up there and had been on the mountain a good deal; that there are many crevasses around the foot of Crater Rock, and down Zigzag Glacier it is broken up in bad shape; that most of these crevasses bridge over and that some of these bridges will hold up a man and others will not, and are unseen many times; that on the east side of Crater Rock is White River Canyon, very rough and steep, and full of glaciers and snow crevasses, and that this condition prevails down to below timber line; that there are steep cliffs on White River Canyon, and that the crevasses run from fifteen to two hundred feet; that during a severe storm, you cannot always see these cliffs or canyons, but when the

storm is not too dense a sort of black space appears."

It was the province of the jury to determine from the evidence submitted whether the insured met with an accident by falling into a crevasse of snow or ice, or into a canyon, or became lost and starved to death, tired and froze to death, or died from natural causes. If death was occasioned from one of the three latter possibilities, there was a greater or less probability, as the jury might have determined from the evidence, that the body would have been found during the search immediately following the disappearance, and, if not found then because of the drifting snow, that it would have been found during the search made in the summer. It is, of course, possible that a body could have lain in an open space, and not have been found; but there was evidence enough to leave that question for the determination of the jury. It is not necessary that evidence be of such weight as to preclude every possibility of error. It is only necessary that there be substantial evidence to support the conclusion reached. The search which the evidence showed was made was sufficient to leave it a question for the jury to determine whether death was the result of accident or one of the other possible causes.

The next question presented is whether there was evidence from which the jury might conclude that the accident occurred prior to the expiration of the policy, resulting in the death of the insured within 13 weeks thereafter.

The evidence discloses that when Leslie Brownlee decided to abandon the ascent and return, he had reached an elevation approximately 9,000 or 10,000 feet; the summit of the mountain being 11,125 feet. A snowstorm was prevailing so that it was impossible to see any considerable distance—"became so bad that they were unable to see or recognize anything except the edge of White River Canyon, which beyond was a deep blue." Lower down on the mountain the two young men had changed their snowshoes for "crampons" or ice-creepers—framework shaped like a shoe to which sharp spikes are attached which prevent slipping on the icy surfaces. The young men left Timber Line Cabin, located on the mountain at an elevation of 6,000 feet, at about 2:30 o'clock that morning. The snowstorm began about seven hours later, increasing in severity as time progressed.

The contention of counsel for appellant that where a person was last seen in a state of imminent peril that might probably result in his death, and has never been seen or heard from again, though diligent search has been made, the inference of immediate death may justly be drawn, has not been controverted by counsel for appellee.

In the case of N. W. Mutual Life Ins. Co. v. Stevens (C. C. A.) 71 F. 258, the court said:

"It is conceded that when one who is last seen in a state of imminent peril, that might probably result in his death, is never again heard from, though diligent search for him is made, the inference of immediate death may justly be drawn."

The rule contended for also appears to find support in the following authorities: Carpenter v. Sup. Council Legion of Honor, 79 Mo. App. 597; Tisdale v. Ins. Co., 26 Iowa, 170, 96 Am. Dec. 136; Lancaster v. Wash. Life Ins. Co., 62 Mo. 121; 17 C. J. 1169.

There was evidence from which the jury could have concluded that Leslie Brownlee was in a state of imminent peril at least from some accident, as soon as he started on his downward course. His being alone increased the peril. He could have fallen into a crevasse, or fallen in some other manner, and sustained bodily injuries which resulted in his death. The peril was imminent, and if the jury found, as it could have from the evidence, that the insured met with an accident, the inference follows that the accident occurred immediately following the separation from Feyerabend. If he met with an accident which merely prevented him from continuing his journey down the mountain, the freezing atmosphere would have extinguished life before the time limit of three weeks, mentioned in the policy, had expired.

The remaining question in the case relates to the time when Brownlee and Feyerabend separated. It is contended by counsel for appellee that there is no proof this separation occurred before 12 o'clock. Feyerabend was unable to testify with any positiveness as to the time he and Brownlee separated. He testified that he "does not remember the things that took place before reaching Government Camp because of the strain of the days that followed." He testified that his recollection was that he reached Battle Axe Inn at Government Camp at about 4:30 in the afternoon. The inn is at an elevation of 4,000 feet, or about 6,000 feet below his starting point on his return journey. A party of four, also making the ascent of the mountain, was seen by Brownlee and Feyerabend, and the latter testified they estimated that they were two hours behind them in time. One of the

members of this party saw the two ahead of them, and estimated the distance between at three-quarters of a mile. This party of four gave up the ascent because of the storm, and "because they were almost frozen to death," at 11 o'clock, and reached Government Camp at 3 in the afternoon. Feyerabend "had no idea how long he traveled after he separated from Leslie; * * * it seemed like it might be an hour." In his downward course Feyerabend walked a mile and a half off the usual course. The witness Lenz testified that he made the descent from the summit of the mountain on January 7, 1927, leaving at 3:40 in the afternoon, and arriving at Government Camp at 9:15; that he estimated the time he made from the summit to Crater Rock at twenty minutes. From Crater Rock to Government Camp he was approximately five hours. Traveling at the same speed, to have reached Government Camp at 4:30 he would have had to have left Crater Rock at 11:30, and earlier if he wandered a mile and a half out of his way.

It is clear that there was evidence from which the jury could have determined as a fact that Leslie Brownlee separated from Feyerabend and started on his downward course prior to noon, when his policy expired.

A motion for a directed verdict, like a motion for a nonsuit, is in the nature of a demurrer to the evidence. In its determination the evidence upon the part of plaintiff must be accepted as true, and every proper inference or deduction therefrom taken most strongly in favor of the plaintiff.

As said by Mr. Justice Harlan in Travelers' Ins. Co. v. Randolph (C. C. A.) 78 F. 754, 759:

"The jury should be permitted to return a verdict according to its own view of the facts, unless upon a survey of the whole evidence, and giving effect to every inference to be fairly or reasonably drawn from it, the case is palpably for the party asking a peremptory instruction."

The evidence presented does not require the basing of an inference upon an inference, but rather it is a case where the same evidence not only supports an inference of death, but also the cause, time, and place thereof.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

RUDKIN, Circuit Judge (dissenting). When the insured parted with his companion one hour before his insurance expired, he was in perfect health, well fed, and well clad; he was in no peril except such as beset his companion and other mountain climbers on that day, and a finding that within that brief hour he met with some unknown accident which resulted in his death, if such a finding is ever made, will of necessity be based on the wildest kind of guesswork and speculation.

The judgment should be affirmed.

