**MUTUAL LIFE INS. CO. OF NEW YORK v. ZIMMERMAN et al.**

**NEW YORK LIFE INS. CO. v. ZIMMERMAN.**

Nos. 7586, 7587.

Circuit Court of Appeals, Fifth Circuit.

Feb. 27, 1935.

Rehearing Denied March 25, 1935.

J. L. Doggett, O. O. McCollum, and Charles Cook Howell, all of Jacksonville, Fla., and Frederick L. Allen and Louis H. Cooke, both of New York City, for appellants.

John G. Graham and M. Caraballo, both of Tampa, Fla., for appellees.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

The appellee, Nellie F. Zimmerman, in September, 1929, brought two separate suits on policies of insurance on the life of her husband, Albert H. Zimmerman, alleging in one count that the insured died August 24, 1927, and that she was entitled to recover the face of the policy, and in a second count that the death resulted from external, violent, and accidental means, to wit, drowning, whereby a double indemnity was due. The suits were tried together, and on June 2, 1934, verdicts were rendered in favor of the defendants on the second count but in favor of the plaintiff on the first count. These appeals followed. We find it necessary to notice but two questions: (1) Whether evidence of the finding of a human femur across Indian river from the supposed place of drowning should have been excluded; and (2) whether a verdict should have been directed for the defendants.

Circumstantial evidence was relied on to show both that Zimmerman was dead and the time and manner of death; the theory being that he was accidentally drowned while wading in Indian river on Wednesday, August 24, 1927. He has not been seen or heard from since, unless two witnesses for the defendants say truly that he was seen by them, respectively, in North Carolina and in Honduras. These witnesses were so far impeached as to make their credibility a matter for the jury, and their testimony is not to be considered for present purposes. The evidence is that Zimmerman was married to appellee in 1910, when twenty-three years old. He bargained for a farm in Missouri for $15,000, but did not pay for it, and entered a hardware business. A daughter, Myrtle, was born. Zimmerman left home and was gone several months. His father advertised for him and offered a small reward, and thus located him in Colorado and brought him home, but appellee says she was in communication with him. In 1912 he went to Florida, where his wife and daughter later joined him. He worked as bookkeeper for one corporation for seven years, and as manager of another for three years, and then became manager of a business of Fugazzi Bros. in Tampa. The wife and daughter and several neighbors testify to his character as a dutiful and affectionate husband and father. Several men say, without contradiction, that he went to and gave mixed parties without his wife, saying that she was not good company and nagged him, and two testify that he had said he was going to buy her a one way ticket back to Missouri. It was testified that he frequently had relations with other women. In 1927, Zimmerman with one Potter had a construction contract in North Carolina to carry out which they had bought twenty trucks and owed for them over $53,000 on title retention contracts; some of the notes being past due and pressing in August. He had bought tires and other supplies from a Jacksonville firm to which he then owed $2,300, and they were pressing him. He had borrowed first $1,000 and then $3,000 from a Mrs. Starke, giving for the latter loan a note signed Fugazzi Bros., per A. H. Zimmerman, manager, though the proceeds of the note did not go to Fugazzi Bros. and the note did not appear on their books. She was pressing for payment. Fugazzi Bros.' books showed that Zimmerman personally owed them $2,262, Potter and Zimmerman $36,561, while a third concern operated by Zimmerman owed $15,561, which sums were afterwards nearly all charged off as losses. There were some bank balances, but all were offset by notes due to the banks. Zimmerman had bought some real estate, an automobile and furniture, but they were unpaid for and after his disappearance not a cent was realized by his family from any source. In July Mr. Charles Fugazzi, who resided elsewhere, had come to Tampa, and Zimmerman was told that Fugazzi was looking into Zimmerman's affairs. Zimmerman was heard to say: "I know I am through." He had insurance on his life, including accident indemnities, aggregating $96,000, but none old enough to have much, if any, surrender value. A premium of $870 on his largest policy went into default August 18, 1927, and a premium of $311 on another was to fall due on August 25, 1927. During August Zimmerman was prospecting with one Johns (Fugazzi also having an interest in the results, if any), seeking a kind of sand in the bed of Indian river. He and Johns waded down it from Melbourne for eighteen miles taking samples, until on Saturday, August 20, they had reached a point opposite San Sebastian Inlet. This is one of several inlets which connect Indian river, a long sheet of still water, with the Atlantic Ocean. Having finished their prospecting he and Johns went to Jacksonville

with their samples on Sunday, August 21st, in Zimmerman's automobile. That night Zimmerman proposed to Johns to go "tomcatting," but Johns was tired, and they did not go. Monday, having delivered the samples, Zimmerman bought an auto tire and got cashed a check for $100 or $150, sending a telegram to Fugazzi Bros. to make deposit of $150 to cover checks drawn. He got Johns to guide him to a rooming house at an address where Zimmerman found a woman called Annie, with whom he seemed well acquainted and who owned an automobile, and they arranged to go together that afternoon to Jacksonville Beach. Johns came by train to Tampa. Zimmerman was next seen with his car at Melbourne Wednesday at about midday. He took a room at the hotel and left a bag in it which afterwards was found to contain only some soiled linen. No suit or toilet articles were there. He left the hotel, giving the clerk two telegrams for transmission. One was to Mrs. Zimmerman reading: "Too tired to drive home tonight and not feeling any too well. Got what we came after and will be home sometime tomorrow. Hope Myrtle is home. Love." The other was to Johns: "Got Victor's and everything is O. K. Will be in Tampa tomorrow on way home. Unable to connect with Melbourne man today. Hear he has done well and will see him in morning." He got in his car, had an interview on the street with a man from whom he wanted a sand lease, and promised to see him in the evening or the next morning. He went south toward San Sebastian Inlet, bought gasoline on the way, using a $10 bill taken from among other bills. About opposite the Inlet stands San Sebastian Inn, not then open, but in charge of a caretaker. There Johns and he during the previous week had been leaving their street clothing and donning their wading costumes in the morning and in the early afternoon taking a bath and dressing, leaving tools and wading clothes with the caretaker. Zimmerman went there, got his wading suit which was dry but did not put it on or leave his other clothing or get any tools, so far as the caretaker knew. He said he would change elsewhere. Usually Zimmerman was very jovial, but this time appeared to be thinking seriously about some not very pleasant subject, and said but little. He looked at the caretaker hard for two or three minutes, then held out his hand and said: "Well, goodbye, Fred." He had never done so before. No witness saw Zimmerman afterwards. About a mile northwards up the road the car turned eastward down a trail leading a short distance through the palmettos to the river, and was found a few feet from the water's edge either the same afternoon or the next afternoon about sunset. The door was open. Shoes and socks, underwear, trousers, and shirt were in it; there being some conflict whether there was a coat and hat there. There was a brief case containing some papers, a brand new hoe, and some samples of sand in the tonneau. No tracks led over the narrow beach to the water, but plain footprints made by a man running led from the car door up the trail to the highway. At the highway there was another automobile track which had come from the north, had turned across the highway just south of the trail, then gone across the automobile tracks in the entrance of the trail and thence back north up the highway. There was conflict as to whether this track was over or under that left by Zimmerman's car, but the weight of the evidence is that it was the more recent. All the tracks and footprints mentioned had been rained on slightly, but not defaced. There had been no rain since Wednesday afternoon. A sand scoop was found standing in the water a hundred yards from the shore, with the handle sticking out a foot. The track of a wagon or other vehicle was seen along the margin of the water, but was not traced to its origin or destination. Indian river at this point is two and a half to three miles wide, but nowhere over eight or ten feet deep. On the west side where the automobile stood the bottom is sandy and flat, and slopes very gently, so that where the scoop was it is only waist deep. On the east side the shore line is rougher, and there are mudholes. Johns testified that in all their wading down the west shore they had met with no trouble. There is no current in Indian river, except that steady winds may pile up the waters and cause one. There is current in the inlets due to the ocean tides, but the effect on the west side is very slight. The weather was settled and fine for a week or more after August 24th. Search was made for the body of Zimmerman, but no trace found. A lookout for buzzards was kept by land, and the water opposite the automobile and out beyond where the scoop was found was seined with a seine three hundred yards long. The body was not found floating, though it should rise in from twenty-four to seventy-two hours. There are sand

sharks in the river, but no one was ever attacked, although children constantly swim in it. There are stingrays, especially on the east side where the water is more salt, and their sting is very painful and paralyzing, but no one has been killed or caused to drown by them. Crabs will feed on a dead body. Zimmerman was six feet tall, weighed over two hundred pounds, was in good health; an expert swimmer and floater. The woman Annie has also been sought, but has not been found.

■ To this evidence there was added, over objection that it was irrelevant and not sufficiently connected with the transaction under investigation, the testimony of several witnesses that in the summer of 1928 across Indian river in San Sebastian Inlet, rather nearer the ocean than the river, the thigh bone of a human had been found sticking in a sandbar, the end of it mossy and green and covered with barnacles. No one undertook to say how long it had probably been in the water. It was supposed at the time to be a bone from an aeronaut who at some unstated date had fallen into the ocean near the inlet. The finders did not know of Zimmerman's disappearance. If this was a bone of Zimmerman, it, of course, established his death. The argument is that his corpse might have floated and been blown by the wind or drawn by a current across the river three or four miles to the inlet, or a shark may have carried it there. It is equally true that it may be only a relic of the many victims of the Atlantic for any number of years back. Only one bone was found. It was three or four miles from the place of disappearance. There was no particular wind or current during the critical period, and the floating body had been watched for. Such sharks as are in the river have never been known to attack a man. There is only a remote possibility and no probability that this bone was Zimmerman's. In cases of circumstantial evidence necessarily there must be great liberality and a large discretion in the range of the circumstances allowed to be proven. Yet there is a limit, and particular care ought to be exercised touching a circumstance which may control the verdict. It will be noted that this bone was found neither at the place nor at the time of the occurrence on trial, but three miles away and a year afterwards. There is nothing whatever to identify the bone as Zimmerman's, or to show that it is more probably his than any **one whose body**

has been lost in the river or the neighboring ocean for many years past. A jury may not under sanction of the court be invited to guess that it might be Zimmerman's. The evidence ought to have been excluded.

■ Does the remaining evidence authorize a finding that Zimmerman is dead rather than a runaway? The policies lapsed shortly after August 24, 1927, and a death before their lapse must be established. Not quite seven years of disappearance had gone by at the time of the trial, so that no presumption of law had arisen concerning death, but if it had the presumption would not be of death at any particular date within the seven years. If death must be established at a definite date before the expiration of the seven years, something besides the presumption is necessary. Davie v. Briggs, 97 U. S. 628, 24 L. Ed. 1086; United States v. Hayman (C. C. A.) 62 F.(2d) 118. The question here is whether Zimmerman was drowned on August 24, 1927, for there is nothing to show that he died by any other means or on any other date. The jury, though finding he was dead, declined to find that the death was accidental. The verdict seems to imply suicide; but in our opinion the evidence does not show that he was dead at all at the expiration of the insurance. None of the uncontradicted and unimpeached testimony which is reasonably credible can be arbitrarily rejected, but all must be construed together. Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819; Arnall Mills v. Smallwood (C. C. A.) 68 F.(2d) 57. We must therefore conclude that while Zimmerman was indulgent and affectionate to his wife and daughter, he also indulged a taste for other women, and was on intimate terms at least with Annie, who had an automobile, and, like himself, disappeared. He had left wife and daughter once before, though he had in late years been active and diligent in business and had held steady employments. It is also true that in 1927 he was headed for financial disaster, and it was imminent, and some of his transactions, especially his borrowing $3,000 on a note signed in the name of Fugazzi Bros., who did not receive the money, seemed likely to embarrass him greatly. He does not therefore stand as one of blameless domestic, civic, and business character who would have every reason to disclose his whereabouts and return to his associates if living, and whose disappearance therefore could only with the greatest difficulty be explained as volun-

tary. Contrast Tisdale v. Connecticut Mut. Life Ins. Co., 26 Iowa, 170, 96 Am. Dec. 136. Part of his insurance was in default with the grace period running out, and all of it would soon be, for it is plainly proved that he was at the end of his means and his credit was disappearing. If the insurance was ever to do the wife and daughter any good, it must be matured at once. On the other hand, he appeared to be going forward with the sand explorations to the last, and telegraphing and otherwise acting as though he expected to continue. His conduct with the caretaker, the last witness who saw him, was peculiar. If he then intended to run away he had cash enough to do so, and no one has seen the cash or pocketbook since. Everything consists with a theory of a prepared appearance of drowning unless it be the plain running footprints. If they were his, they may have been made thoughtlessly in getting out of the rain, or in haste to reach an automobile waiting at the highway for him. Some one else may have made them, perhaps, after taking his money from his clothing, but this is mere speculation. The sand samples are not shown to have been freshly taken. The scoop, if Zimmerman's, may have been left in the water Saturday. The theory of actual drowning falls before the facts that there were no tracks to the water and no finding of the body and no reasonable explanation for not finding it under all the circumstances. There is a possibility that he is dead, but the circumstances are not such as to make that the only probable explanation of them. Circumstantial evidence, even in a civil case, must not only consist with the theory that authorizes recovery, but must fairly and reasonably exclude any other explanation of the facts. Unless it does this, the burden which rests upon the plaintiff to prove her case is not carried. Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819; Florida East Coast R. Co. v. Acheson, 102 Fla. 15, 135 So. 551, 552, 137 So. 695, 140 So. 467; Foster v. Thornton, 113 Fla. 600, 152 So. 667. There is no proof here of an unusual peril to the insured which would probably have killed him, as referred to in Davie v. Briggs, 97 U. S. 628, 24 L. Ed. 1086, and Brownlee v. Mutual Benefit Health & Acc. Ass'n (C. C. A.) 29 F.(2d) 71. The evidence does not with certainty put Zimmerman into the water, and if it did no danger appears on the west shore of Indian river to one of Zimmerman's aquatic accomplishments. In Fidelity Mutual Life Ass'n v. Mettler, 185 U. S. 308, 316, 22 S. Ct. 662, 665, 46 L. Ed. 922, there was no motive besides the insurance for the insured voluntarily to disappear and "the footsteps to the river's brink, going but not returning, the water buckets, the mark of slipping, the fractured root, the flowing stream" seemed to put him into the water and to account for the disappearance of the body. Yet it is judicial history that what appeared evidences of drowning were fabrications, and that after the insurance money was paid the insured turned up alive. Fidelity Mutual Life Ins. Co. v. Clark, 203 U. S. 64, 27 S. Ct. 19, 51 L. Ed. 91. We think the circumstances here are too inconclusive to show a drowning at the time and place supposed. Claywell v. Inter-Southern Life Ins. Co. (C. C. A.) 70 F.(2d) 569; Brownlee v. Mut. Ben. Health & Acc. Ass'n (C. C. A.) 29 F.(2d) 71.

The judgments are reversed, and the causes remanded for further proceedings not inconsistent with this opinion.