## NATIONAL LABOR RELATIONS BOARD v. GOSHEN RUBBER & MFG. CO.

### No. 7096.

Circuit Court of Appeals, Seventh Circuit.
Feb. 24, 1940.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Mortimer B. Wolf, and Louis Newman, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

George L. Pepple and Harry E. Vernon, both of Goshen, Ind., for respondent.

Before SPARKS, TREANOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

In a case duly instituted and heard, the National Labor Relations Board issued an

order,[1] pursuant to the provisions of Sec. 10(c) of the National Labor Relations Act, 49 Stat. 449, 454, 29 U.S.C.A. § 151 et seq., requiring the respondent: (1) to cease and desist (a) from discouraging membership in United Rubber Workers of America, Local No. 124; (b) from interfering with, restraining, or coercing its employees in the exercise of the right guaranteed them by Sec. 7 of the Act. The order further required the respondent (2) to take affirmative action, viz.: (a) offer to certain employees immediate and full reinstatement to their former positions; (b) make them whole for any loss of pay they may have suffered; (c) to post and maintain notices for 60 days that respondent will cease and desist as set forth in 1(a) and (b); and (d) to notify the Board's Regional Director of the steps taken to comply with the order.

The respondent did not comply with the order, contending that the findings of fact were not supported by substantial evidence, and the Board petitioned this court for enforcement thereof.

The proceeding before the Board was instituted by Local No. 124 of the United Rubber Workers of America (hereinafter referred to as the "United"), affiliated with the Committee for Industrial Organization. The amended complaint charged inter alia that the respondent had coerced the employees in the exercise of their right to self-organization in violation of Sec. 8(1) of the Act, and had discharged three employees in violation of Sec. 8(1) and (3) of the Act.

Respondent answered, admitting certain of the jurisdictional allegations, but denied that it had engaged in any unfair labor practices.

The record discloses that respondent is an Indiana corporation engaged in the manufacture, sale and distribution of molded rubber goods and similar products, such as bottle stoppers, rubber bumpers, and gaskets. Its plant at Goshen, Indiana, is divided into several departments, namely, the machine, punch press, buffing, heater, mill, trimming, and shipping departments, and gives employment to 109 persons, namely, 9 in the office, 11 foremen, and 89 production employees.

Rubber is received in a raw state, in 1937 mostly from extra-state sources, and placed in stock. This rubber is taken as needed and mixed in batches according to chemical formula. The material is then formed into suitable sizes and shapes, often vulcanized in the heater room, then cut or trimmed, punch press work done thereon, and finally inspected. In 1937 interstate sales of the many finished products compared with local sales in the ratio of 4 to 1.

Prior to 1937 the employer-employee relation had been harmonious. In January 1937 the employees of the punch press and mill departments of the plant worked 11-hour shifts, and although they were paid by the hour, some of the employees expressed dissatisfaction over the long hours, which, on February 3 or 4, took the form of a petition for shorter hours. Yet, prior to April 1937 there was no labor organization or unionization talk among the employees in the plant. There was no unrest among the employees over union matters and the employees had no real quarrel with working conditions but the company was watching the sit-down tactics taking place in Detroit.

On February 5, 1937 the petition for shorter hours was taken to Elmo Niccum, respondent's sales manager, who, after reading it, said the employees were a bunch of sissies and could not take it. It also appeared that one Merle Armstrong, a press operator, who had been active in the circulation of the petition, pinned on one of the shop bulletin boards a paper subscribed "The Union Leader." This paper described the working conditions and gave notice of a union meeting to discuss the conditions. In truth, there was no union, and the paper was intended to serve "as kind of a joke."

On April 10, 1937 the United membership campaign was started, which, by May 10, had about 25 of respondent's employees. These employees elected officers, wore union buttons, and asked for a conference with respondent. On May 11 the United committee conferred with respondent; they requested recognition and the posting on the bulletin board of a promise not to discriminate against United members. A witness for the Board testified that Gordon Pease, general manager, promised there would be no discrimination, but as to the recognition, stated he would have to have some time to think the matter over, inasmuch as they had not shown a majority in the plant.

On May 12 there appeared in the plant a petition, prepared by foreman Harold Kintigh, stating opposition to any labor organization "other that that which might be organized solely among the employees." It was signed by 40 production employees and

6 foremen. Lloyd Stump (foreman of the trimming department) took it into the trimming room and told the employees therein that "they could all read it and use their own judgment about signing it," adding that he "believed the office might approve of it." During this period Raymond Hoffman, secretary of the United, informed Morris Cripe (superintendent) that he objected to the circulation of the petition as a violation of the Wagner Act, whereupon Cripe prepared a written notice to the foremen, instructing them not to assist or aid in the circulation of any petition relative to employee-employer relationship.

After this notice a second petition, similar in all respect to the first, was again circulated and signed by 49 employees. This time all of respondent's nine foremen signed the petition. Foreman Claude Gardner testified that he did not dislike the United, but opposed it in the factory; that he signed the petition on the theory that the "instructions did not say that I was not to sign" and because he thought such conduct would not influence the employees under him. Foreman Harold Kerlin never disliked the United, but he signed because he "figured the rest of them (foremen) would sign." On the other hand, foreman Leslie Schoomaker opposed the United, "was in hopes that they didn't get the majority of the employees."

On May 14 respondent posted a statement entitled "A Message to Employees. Facts about the Wagner Act." It related facts in question and answer form: (1) Employees are not required to join a union; (2) Collective bargaining does not compel employers to reach an agreement of any nature; (3) Closed-shop agreements are not required by the Act; (4) An employee may elect to deal directly with his employer and not through a labor organization; (5) Employees may organize or belong to an organization confined to the boundaries of a plant or employer; and (6) Employers still retain their right to select and discharge their employees.

Later in May the United committee presented respondent with a memorandum of agreement, requesting collective bargaining and a pledge against discrimination. The committee was told the United did not represent a majority of the employees. It is well to note here that at no time did the United claim to represent more than thirty per cent of the employees.

Sometime during the summer the employees who had signed the inside organization petition organized the Goshen Rubber & Manufacturing Company Employees Association (hereinafter referred to as the "Association"), and on June 19 respondent posted a notice recognizing the Association as the collective bargaining agent of the employees, but in August, at the request of a representative of the National Labor Relations Board, discontinued to recognize the Association and it was disbanded.

In September George Kerlin and foreman Schoomaker went to Elkhart, Indiana, to see an organizer for the American Federation of Labor. In October Local #21254 of the Federal Labor Union, an affiliate of the American Federation of Labor, was chartered, and by November 1 this union was recognized as the exclusive bargaining representative of the employees by the respondent which entered into a closed shop contract effective January 1, 1938. By November 1, 67 employees had joined Local #21254, and by January 1, 1938, the other employees had joined except Everett Penrose and Loraine Boshart, who belonged to the United and refused to join Local #21254. Earl Lantz, president of the United from May 8 until November 29, joined Local #21254 in December and became president of that organization.

In this connection, the group that supported the inside organization petition and later organized the Association represented substantially the same group of people that later formed Local #21254. Moreover, foreman Schoomaker, who admitted that the United people in the plant were a "touchy spot" with him, accompanied George Kerlin in September to see the American Federation of Labor organizer. Leslie Schoomaker testified that he had first asked Gordon Pease about this, and Gordon Pease told him he "could do as I (he) pleased" about it. On the question of unionization in general, Gordon Pease testified that he "took the first one (organization) that came with a majority."

Based upon the foregoing facts, the Board found that the respondent had discouraged activity in behalf of the United and interfered with self-organization among the employees, thereby violating Sec. 8(1) of the Act.

██ We are bound by the Board's finding of fact as to matters within its jurisdiction, where the findings are sup-

ported by substantial evidence. National Labor Relations Board v. Waterman Steamship Corp., 60 S.Ct. 493, 84 L.Ed. ——. Substantial evidence is more than a mere scintilla, Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126; it must be acceptable to a "reasonable mind * * * as adequate to support a conclusion," Consolidated Edison case, supra; "and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict." National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660.

In Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720 it was said:

"A mere scintilla of evidence is not enough to require the submission of an issue to the jury. * * * 'before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

\*     \*     \*     \*     \*

"Where the evidence upon any issue is all on one side or so overwhelming on one side as to leave no room to doubt what the fact is, the court should give a peremptory instruction to the jury."

■ Applying the law to these facts and all the reasonable inferences drawn therefrom, particularly the favored treatment accorded to the employees circulating petitions for an inside organization during working hours, and the encouragement given by respondent's general manager to enlist and to bring into the plant the American Federation of Labor, we are of the opinion there was sufficient evidence to establish a reasonable basis for the conclusion of the Board that respondent had discouraged activity in behalf of the United and interfered with the rights of self organization on the part of its employees, and that respondent was guilty of engaging in unfair labor practices. National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 262, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Consolidated Edison case, supra.

The only other question remaining for discussion is that part of the order requiring respondent to offer to certain employees reinstatement and make them whole for any loss of pay.

The evidence discloses that Merle Armstrong had worked for two years for respondent, and had been considered a good workman. On February 8, Armstrong was told to report to Morris Cripe, who informed him that he was laid off for two weeks. According to Armstrong, Cripe told him he was "trying to cause trouble around the shop; that he was trying to get the union in here." Cripe did not specifically deny Armstrong's testimony, but did testify that he had discharged Armstrong because he was causing disturbances about the time the petition for shorter hours was being circulated; that those who would not sign he called names; that he was interfering with the work of Harvey Hively, bothering him to such an extent that his nerves were so upset he could not do his work; and that he had asked John Frieburger to slow down production.

Foreman Leslie Schoomaker testified that Armstrong had not been attending to his duties, that his molds quite frequently were lying on the bench while he wandered around the shop. In this regard Schoomaker was corroborated by George Kerlin.

Lyle Armstrong was employed by respondent from August of 1936 to May 21, 1937. On May 1, 1937 he was one of the night shift. On that day, having heard that a petition for an inside union was being circulated, he decided to stop it. He took the petition from the shipping room and gave it to Earl Lantz. That night he was instructed to report the next morning for work on the day shift. On May 21 foreman Hower endeavored to correct Armstrong's method of operating the press. He admits he refused to operate his press as directed and that words ensued, and that he asked Hower "what in hell he was going to do about it." He was thereupon discharged for refusing to obey instructions. George Kerlin, Coulter Longcor, and foremen Gardner and Schoomaker corroborated Hower's testimony that Armstrong had not been operating the molds in the customary and proper manner.

Raymond Hoffman had worked for respondent for almost five years. In April of 1937 he joined the United, became its financial secretary, and was a member of the committee conferring with respondent. He was discharged on June 17, 1937, because he had smoked a cigarette during working hours on the evening of June 16.

The evidence is uncontradicted that there were signs in the plant bearing the inscrip-

tion "Smoking prohibited" or "No Smoking," that he had been informed he would be discharged if caught smoking during hours, and there was testimony to the effect that Armstrong had admitted he could not work ten hours without smoking.

Harold Kerlin testified that he had observed Hoffman leave his work and smoke a cigarette in the outside courtyard adjoining the boiler room, and that he reported that fact to his superior. George Stump testified that Hoffman had told him that "he believed someone caught him smoking." There was evidence that other workmen had been discharged for smoking.

■ It is well to remember that the National Labor Relations Act does not interfere with the normal right of the employer to select his employees or to discharge them, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 46, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; that the burden of proving that an employee has been discriminatorily discharged is upon the complainant and the Board, National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 957; that interference with the right of an employer to determine when an employee is inefficient should not be lightly indulged in when applying the Act, National Labor Relations v. Thompson Products, 6 Cir., 97 F.2d 13, 17, and that orders without a basis in evidence having no rational probative force, are not justified. National Labor Relations Board v. Falk Corp., 7 Cir., 102 F.2d 383.

■ In the instant case we do not believe that the findings of the Board as to the discriminatory discharges of the two Armstrongs and Hoffman are sustained by substantial evidence. There is no direct evidence whatever that these men were discharged because of union activities, and we have been unable to find any evidence of circumstances which a reasonable mind might accept as adequate to support the conclusion that they were discharged for union activities. Here it is to be noted that Merle Armstrong was not a member of the United and that he was discharged before there was any unionization talk at the plant. While the fact that Lyle Armstrong and Hoffman were members of the United may furnish grounds for suspicion that their discharge was on that account, on the other hand, Earl Lantz, then president of the United, and 25 other employees who were members of the United were not discharged. To us the evidence is clear that Lyle Armstrong was discharged for refusing to obey instructions, and Hoffman for violating the rule prohibiting smoking during working hours, and Merle Armstrong for inefficiency and causing disturbances at the plant.

We conclude for the reasons stated, that the order of the Board be modified by eliminating therefrom paragraphs (a) and (b) of Section 2, which relate to the reinstatement of Merle Armstrong, Lyle Armstrong, and Raymond Hoffman, with back pay; and, as thus modified, the order of the Board will be enforced.

Modified and enforced.

TREANOR, Circuit Judge (concurring in part and dissenting in part).

I concur with the majority holding that there is substantial evidence to support the Board's finding that respondent had discouraged activity on behalf of the Union and had interfered with the rights of self-organization on the part of its employees and by such conduct had engaged in unfair labor practices.

As to that part of the order of the Board which required respondent to offer reinstatement to three employees who had been discharged and make them whole for any loss of pay I am of the opinion that the Board's order should be affirmed in respect to Raymond Hoffman.

It has been stated frequently, in accordance with the statutory requirement of the National Labor Relations Act, that any finding of the Board is binding on a reviewing court if the finding is supported by substantial evidence. The requirement of "substantial evidence" is met if there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [1] The Supreme Court has stated that substantial evidence "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." [2] The foregoing statement is of special value since Circuit Courts of Appeals frequently have passed upon the action of trial courts in overrul-

---

[1] Edison Co. v. Labor Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126.

[2] National Labor Relations Board v. Columbian Co., 306 U.S. 292, 300, 59 S. Ct. 501, 505, 83 L.Ed. 660.

ing motions to direct verdicts. It has long been the recognized rule that the reviewing court does not review the evidence as an original fact finding tribunal; it does not attempt to settle conflicts in evidence or to determine questions of credibility. On a motion for a directed verdict the trial court must resolve all conflicts in the evidence against the movant,[3] and the credibility of the witnesses and the weight of the evidence are for the jury.[4] A motion for a directed verdict is equivalent to a demurrer to the evidence and is tested by the same rules.[5] "On a demurrer to the evidence by the defendant the plaintiff's evidence must be taken as true and the contradictory evidence of defendant must be disregarded."[6] "A motion for a directed verdict * * * is in the nature of a demurrer to the evidence. In its determination the evidence upon the part of plaintiff must be accepted as true, and every proper inference or deduction therefrom taken most strongly in favor of the plaintiff."[7]

It follows from the foregoing that when this court passes upon the question of the sufficiency of the evidence to support a finding of the National Labor Relations Board we must resolve all conflict in the testimony in favor of the finding, accept as true all testimony favorable to the finding, disregard all testimony adverse to the finding, and give effect to all reasonable inferences which tend to support the finding of the Board. Furthermore, ordinary rules of competency do not apply and any evidence heard by the Board, oral or written, must be considered if it can be said to have "rational probative force."[8]

When the testimony relating to the discharge of Hoffman is considered in the light of the foregoing well established rules I think there is substantial evidence to support the Board's finding.

Hoffman had worked for respondent for almost five years and in April, 1937, he joined the United, became its financial secretary and was a member of the committee which conferred with respondent. He was discharged June 17, 1937, because he had smoked a cigarette during working hours on the evening of June 16, 1937; at least this was the only reason given Hoffman at the time of his discharge. There was conflict in the testimony respecting the smoking habits of the men in the plant. There was testimony that it was customary for employees, during working hours, to go to the boiler room, where Hoffman's alleged smoking took place, despite the "no smoking" notices posted in the plant; and there was testimony that this practice was known to respondent's foremen and that they had participated in the smoking. There was testimony by respondent that an employee had been dismissed three or four years previous to the dismissal of Hoffman for violation of the rule against no smoking; but no one was discharged in the intervening years despite the continued smoking of employees in the plant. An employee when called as a witness by respondent testified that Hoffman said that he believed that "someone caught him smoking;" but this employee when testifying as a witness for the Board stated that he was in a position to see Hoffman at the time that Hoffman was supposed to have smoked and that he did not see him smoking. In his testimony as a witness of the Board and during cross examination by respondent the employee had not testified to anything which would suggest that he had any reason for believing that Hoffman was smoking. Hoffman testified that he did not smoke at any time during the evening on which he was charged with smoking, and when recalled as a witness after the employee had testified Hoffman denied that he had told the employee that he thought someone had caught him smoking. Hoffman testified that he had smoked many times on company time and premises and had done so with "foremen in the plant."

At the hearing respondent gave as additional ground for discharge of Hoffman that Hoffman's work had been unsatisfactory. Hoffman's foreman and the general manager of the plant testified that Hoffman was inefficient and indolent and the general manager testified that various foremen had

---

[3] Chesapeake & Ohio Ry. v. Martin et al., 283 U.S. 209, 213, 51 S.Ct. 453, 75 L.Ed. 983.

[4] Western & Atlantic R. v. Hughes, 278 U.S. 496, 498, 49 S.Ct. 231, 73 L.Ed. 473; Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720.

[5] Schuchardt v. Allen, 68 U.S. 359, 369, 1 Wall. 359, 17 L.Ed. 642; Brownlee v.

Mutual Benefit Health & Accident Ass'n, 9 Cir., 29 F.2d 71; Chesapeake & Ohio v. Martin, supra.

[6] 26 R.C.L. 1062.

[7] Brownlee v. Mutual Benefit Health & Acc. Ass'n, supra [29 F.2d 76].

[8] Edison Co. v. Labor Board, supra, 305 U.S. page 230, 59 S.Ct. page 217, 83 L. Ed. 126.

complained to him about the small amount of work done by Hoffman. But the only occasion upon which he had spoken to Hoffman about unsatisfactory work was "a couple of years ago." Hoffman's foreman testified that he never had admonished Hoffman concerning his work. The testimony indicates that on one occasion Hoffman was criticized for his work but it also appears from the testimony that his apparent shortcoming was satisfactorily explained, and that it was not due to any fault of Hoffman. The foreman who claimed to have seen Hoffman smoking reported to the superintendent of the plant and on the following day the superintendent gave Hoffman a written notice of discharge without any investigation of the foreman's charge and without talking to Hoffman.

The testimony certainly is not strikingly convincing that there was any intention on the part of the management to discharge Hoffman on the ground of inefficiency; and the testimony does not carry strong conviction that Hoffman would have been discharged, under the circumstances, solely because he smoked on the evening in question. And in connection with this comment, the Board no doubt thought that some significance should be attached to the fact that on the hearing respondent took the position that the inefficiency of Hoffman was a contributory cause of his dismissal. It is a reasonable inference from the testimony that the owners, officials, and foremen of the plant strongly desired that either a company union or an A. F. of L. local become the representative of the employees in preference to the United local. This was not significant in itself but there was some testimony which indicated dissatisfaction with the activities of Hoffman as a member of the United.

The possible causes of dismissal which the testimony indicates are (1) inefficiency, (2) smoking on duty, and (3) union activities. The reason given to Hoffman for his discharge was smoking on duty. Since the Board could have concluded that smoking, under the circumstances which attended Hoffman's alleged smoking on the night of June 16, was treated lightly by the management of respondent and, for at least three years had not been considered a cause for discharge, it cannot be said that the Board was unreasonable in inferring that the alleged smoking was not the actual cause of Hoffman's discharge in view of the fact that there was some testimony which indicated

that the discharge was for inefficiency or for union activities. As between inefficiency and union activities, I am unable to say that there was not enough evidence of "rational probative force" (Edison Co. v. Labor Board, supra) to support the Board's conclusion that Hoffman was discharged because of his union activities.