MUTUAL LIFE INS. CO. OF NEW YORK v. HAMILTON.

HAMILTON v. MUTUAL LIFE INS. CO. OF NEW YORK.

OAKLAND CORPORATION v. SAME.

No. 10929.

Circuit Court of Appeals, Fifth Circuit.

June 28, 1944.

Rehearing Denied July 27, 1944.

H. Reid DeJarnette, of Miami, Fla., for Mutual Life Ins. Co.

Dewey Knight, of Miami, Fla., for Oakland Corporation and Minnie L. B. Hamilton.

Before HUTCHESON, McCORD, and WALLER, Circuit Judges.

WALLER, Circuit Judge.

The question presented is whether the insured, Walter F. Hamilton, was dead or dodging prior to the time that his life insurance policies would have lapsed were he then alive. The jury found that he died on the 29th day of December, 1928, the day after the night on which he packed his belongings and set forth either into eternity or obscurity. According to the proof, naught has been heard of him since that date. As in many other cases of missing persons, he had insurance in a substantial sum for one in his financial and social position. Basing their right to recover upon the common-law rule that unexplained absence of a person from his last or usual place of residence without having been heard from for a period of more than seven years raises a presumption of his death, the wife, beneficiary in the policies, and the Oakland Corporation, a successor in right to a creditor-assignee of a sufficient amount of the policies to pay a loan made by the absentee, brought suit. The jury found for the wife. The Court found against the corporate plaintiff. Appeals and cross-appeals resulted.

A maze of circumstances, proximate and remote, was showered upon the jury and coursed into this record. The jury, peering into the fog, professed to have seen through the dim light the death of Hamilton on the day after he left his daughter's home the night before in Jacksonville, Florida. It is for us to determine whether or not the jury could have seen, in the encircling gloom, that which it reported had been revealed unto it.

The absentee, a husband and the father of six children, was engaged in merchandising and farming in Marshallville, Georgia, where, prior to 1921, he was convicted of living in adultery with a negro woman, for which he served a term in the penitentiary of Georgia. In 1921, Hamilton and his family moved to a point below Miami, perhaps with the two-fold purpose in his mind of removing himself from the woman with whom he resumed illicit relations after his release from prison, and of escaping the stigma that usually attaches to a convicted felon. In each of these purposes, if they were his purposes, he appears to have succeeded, because it does not appear that the dark shadow of the woman crossed his path again, and the sordid story of his malefactions apparently did not migrate to his new home, for there he became prosperous and a deacon of the church, holding the approbation of his pastor, who testified at the trial that he had never heard of the erstwhile moral turpitude of his deacon.

According to the plaintiff's testimony, the family at about this time had little but it was happy, and Hamilton was a good and affectionate father. Then the Florida boom came and with it prosperity. A $14,000 home was purchased for $3,500 cash and the balance on terms. Two of the daughters married; another fitted herself as a teacher. When the boom broke so did Hamilton. He lost his home, his business, and his health. Several business ventures resulted in failure, and in this situation he became gloomy and despondent. He borrowed from Southern Bank and Trust Company, assigning his insurance policies as collateral security. In this low state of health and finances, he received a telegram to come to Cuba, where he said that he expected to improve his financial situation, but in what manner or in what business or work was not shown.

The last time his wife ever laid eyes on her husband was when he bade her goodbye at the station on leaving for Cuba, via Key West. Shortly Hamilton returned from Cuba. His sojourn had not been successful either from a health or financial standpoint. Returning through Miami, he insisted that his oldest son, who was the only member of the family that he contacted, should not let his mother, Hamilton's wife, know that he had returned or passed through; that he was going further north seeking work and improved health.

This was in the early summer of 1928. The young son testified that the father was sick, dispirited, and despondent; that he did not advise him as to his intended destination, but that he was going to try to find something to do up the country; and that he wanted to get things straightened out before he let the family know of his whereabouts.

Hamilton later was in Macon, Georgia, visiting his aged mother, who supplied him with medical services, for he was then suffering from loss of weight, nervousness, bronchitis, and a disturbing cough. She also furnished him $150 to go north. It was later learned that he was at Gloversville, New York, from which point he wrote some letters to members of his family, including one to his wife dated August 26, 1928, in which he stated that his health was not good, his nerves were shattered, he was unable to work, and that he contemplated returning to Macon, and to endeavor to collect disability benefits from his insurance policies. His mother also advanced him $75 with which to return to Macon.

Mrs. Hamilton, not having seen her husband since he had left for Cuba, became suspicious of a suspected, or reputed, relationship of her husband with a Mrs. Louckes, and undertook to check up on her husband in this connection. To that end she addressed a letter to the Chamber of Commerce at Gloversville, and in reply was informed that her husband had visited the Chamber of Commerce in company with a Mr. and Mrs. Louckes. It is not clear what effect, if any, this knowledge had in the marital relationship. Since the wife had apparently forgiven and overlooked her husband's connection with the Georgia woman, it is not difficult to assume that she would doubtless have done likewise even if her suspicions in reference to her husband's relations with the Louckes woman had been definitely substantiated.

According to the mother, her son had lost considerable weight, he was gaunt, stooped, nervous, and discouraged when he returned to her in Macon.

In the meantime, the daughter, Marie, by teaching, assisted some by her brothers, supported the family. It was testified that the husband's financial failures, as well as his failure in health, preyed upon his mind to the end that he became progressively more despondent.

While at his mother's home in Macon the Insurance Company refused to recognize his claim for disability benefits. Low in health, spirits, and finances, instead of returning to his wife and family, he induced his mother to mortgage her home and lend him $1,500, with which he, his son-in-law, and daughter, Mr. and Mrs. Eubanks, who lived in Macon, went into the business, in Jacksonville, Florida, of selling, or attempting to sell, a deodorant or purifier for refrigerators. With them he left Macon for Jacksonville in November, 1928. This business, like his other recent financial efforts and undertakings, was unprofitable, and it is in evidence that he became more silent, somber, and depressed, and that he continued to cough and to worry. While at Jacksonville his claim for disability benefit payments was again refused by the Insurance Company.

Near the middle of December, 1928, when it had been determined that the income from the refrigerating business was insufficient to support the three, he told his daughter that he was thinking of getting out of the business and finding employment somewhere else. The conversation between them is material and a portion of her testimony regarding it will be set out:

"A. Well, along about the first, or maybe the second week of December, he began talking about getting out of the business, just leaving it to us and finding employment somewhere else. He thought maybe there would be enough income for the two of us, and he wanted to find employment for himself then later he said he would leave, and I asked him what he planned to do, and he wouldn't tell me. He said he would find a way all right.

\*  \*  \*  \*  \*

"Q. Do you remember any other statement that was made by your father to you at a time when he was crying? A. Yes."

"Q. Tell that to the jury. A. We were in the office alone at the time. My husband was at home ill with the flu. My father was talking about what he would do, or, rather, the fact that he was going to get out. I tried to get him to tell me what his plans were and he said no, that he would not tell me, that he would find a way, and then he shed a few tears and said, 'I just hope that what I am going to do will be for the (good) of all the family.'"

"Q. Did he make any statement at that time or at any other time about troubling

the family? A. He did at one time say that he would never bother mother, that is, my grandmother, about money any more."

On December 18, 1928, Hamilton wrote the Southern Bank and Trust Company, from whom he had borrowed some six thousand dollars on the security of the two insurance policies, asking the bank to put up the difference between the dividends and the premiums and in this fashion to pay the premiums. The quarterly premium on one policy fell due on December 5, and the annual premium on the other policy fell due on December 11, respectively, and each policy evidently carried the usual grace periods. In the letter to the bank was this statement from Hamilton:

"I had made arrangement to get this money from my mother in Macon, Georgia, but the unfortunate crash of the Fourth National Bank caught her for every cent that she had. I hope that for the protection of your bank and my family some arrangements may be made.

"I have been in bad health for quite awhile and unable to work, but I guess I will be all right or dead one by the time another premium comes due after this one.

"With best wishes and asking your help, I am, etc."

The bank put up the money necessary to carry the policies for one year.

When Christmas came his daughter, the teacher, sent him some handkerchiefs for Christmas, which he returned to her. She testified: "A. Well, he sent me the handkerchiefs back and told me to give them to the boys, my brothers, or someone else, he wouldn't need them. That's just what he said; he said he wouldn't need the handkerchiefs."

On the night of the 28th of December, 1928, he knocked at the door of Mrs. Eubanks' room at their boarding house in Jacksonville, gave her the key to their office and stated: "You might as well take it now." This daughter also testified that he said, in reference to the key, that he would not need it any more. The following morning Mr. Hamilton was gone, and according to the evidence he has not been seen or heard of since that date. He had taken his suitcase and all of his clothes, and had not slept in his bed the night before.

On the Saturday before the night on which Hamilton disappeared, his daughter gave him $19, $10 of which was to pay his board in advance, and $9 of which was to pay the doctor. The record does not show whether these bills were paid or not, and so far as the daughter knew these were all the funds that he had.

The family was not particularly excited over his disappearance and thought that he would show up at the home of some member of the family within a few days.

In April, 1929, Mrs. Hamilton wrote the Insurance Company a letter containing the following statement, in reference to her husband: "The family does know that he has been following a man who had worked for him around on account of his wife." Mrs. Hamilton had reference to Mrs. Louckes, heretofore mentioned.

On this state of facts, aided by the common-law presumption, the jury found that Walter F. Hamilton died on the 29th day of December, 1928, or on the day after the night on which he left his boarding house in Jacksonville. No testimony of the finding of a dead body, nor the finding of any trace or effects of Hamilton, was produced. There is no proof that he was in any immediate peril, and while he was thin and gaunt there is no proof that he was afflicted with any fatal malady. Although he had a cough, the diagnosis as to tuberculosis was negative.

The law in the case is not difficult and was well stated by this Court in the case of United States v. Hayman, 5 Cir., 62 F.2d 118, and in the later case of Mutual Life Insurance Co. of New York v. Zimmerman, 5 Cir., 75 F.2d 758. In the present case the evidence is sufficient to go to the jury for the purpose of attempting to establish the presumption that Hamilton is dead, but in view of the fact that the premiums on the policy were not paid after the payments were made by the bank as mentioned above, it is necessary not only to establish the presumption of death, but to prove that he died while the policies of insurance were in force, or at least within that premium year. The appellees recognized this responsibility and undertook to meet it by showing the poor state of health of the absentee, his financial disappointments and failures, his depressed state of mind, and insist that the statements made to his daughter, Mrs. Eubanks, that he hoped that what he was going to do would be for the best for all concerned, and his statement in the letter to the bank requesting payment of the premiums that he would be all right or dead before another premium came due, his return of the Christmas handkerchiefs,

his disappearance in the night, together with the fact that nothing had ever been heard from him since that night, are sufficient to sustain their contention that Hamilton committed suicide on that date. There is no proof that he was possessed of any disease or ailment that was reasonably expected to cause his death on the date in question, or that he was possessed of a fatal malady, so if the jury's verdict that Hamilton died on the 29th of December, 1928, is sustainable it is on the theory that his death came by suicide or accident at that time. Assuming that the presumption that Hamilton is dead has been established by the proof in this case, no presumption can be indulged in as to the time or date of his death. There is no presumption that he died the day he disappeared any more than there is that he died on the last day of the seven-year period. In cases where a recovery is sought on an unmatured policy of life insurance, the burden is on the plaintiff to show that death occurred while the policy was in force, and the presumption of death will not aid the plaintiff in this effort except that if the presumption is established it will be presumed that death occurred at some time within the seven-year period. See United States v. Hayman, supra; Mutual Life Ins. Co. v. Zimmerman, supra.

Into the darkness into which Hamilton stepped on the night of December 28 he carried the answer to numerous questions, which we now seek to find, some of which relate to whether or not the presumption of death has been established as the Florida statute for the appointment of an administrator of the estate of a seven-year absentee seems to require,[1] while some relate to the question of the time of the death, assuming that death has occurred:

Was Hamilton the affectionate, home-loving husband and father as pictured by some of the family, who would yearn continuously to return to the bosom of that family and who would constantly seek news of their welfare, or was he a lean, lewd, and lascivious Casanova, familiar with the solace of lustful women, who preferred their companionship to that of his admittedly unaffectionate spouse?

Was he the loving husband and father, who would be presumed to keep in touch with his home and family, in view of the showing that on his return from Cuba through Miami he kept his presence hidden from, and failed to visit, his family, other than one of his sons, from whence he secretively moved on to places unknown?

Even though the milk of his marital relations was strained and sour, was he so bitten by the serpent of ingratitude that he would slink off into the dark without casting one long and lingering look behind at his aged mother, who had sought to woo back his shattered health and whose loyalty to him resulted in the mortgaging of her home for his benefit?

Was his visitation in Gloversville, New York, with Mr. and Mrs. Louckes one motivated wholly by an effort to gain health and employment?

Is it not the normal act of a father who is interested in his home and family to seek surcease from his sickness, disappointments, and sorrows in the bosom of that family rather than among outsiders, such as Mr. and Mrs. Louckes, and in places hundreds of miles away?

Is it the act of a father and husband interested in home and family to absent himself from that family from the early part of the year 1928 until its end, during much of which time he was without gainful occupation or employment?

If the motive of the insured was to commit suicide so as to improve the financial situation of the family which he had not seen nor sought to see in so long, why did he not make the proof of his sacrifice available so that the body could be found and proof of his death made? If he were

---

[1] Florida Statutes, 1941, F.S.A.:

"734.33 Evidence of presumption. At the hearing, the county judge shall take such evidence as shall be offered, for the purpose of ascertaining *whether the presumption of death is established*, and no person shall be disqualified to testify by reason of his relationship as husband or wife to the supposed decedent, or of his interest in the estate of the person believed to be dead.

"734.34 Order of presumption. If satisfied upon the hearing, that the legal *presumption of death is established*, the county judge shall so order, and shall forthwith cause notice thereof to be published as provided in this law, and also once a week for four consecutive weeks in a newspaper published at or nearest the place where last heard from. The said notice shall require the supposed decedent, if alive, or any person for him, to produce within three months from the date of its first insertion satisfactory evidence of *his continuance in life*." (Emphasis added.)

making the supreme sacrifice for the sustenance and support of his family, why did he not leave a note to that family in order that the result of his acts might have the desired fruition?

If he planned to fare forth into eternity, why did he take his grip and clothes, which habiliments he must have known he could not take beyond the grave?

If he committed suicide or otherwise died on December 29, why was not some trace found of either his body or his personal belongings?

If he could stand in the face of his family, unabashed and unashamed, after having served a sentence in the penitentiary for a highly immoral offense, does it stand to reason that he was afraid to stand in the presence of his family merely because his health and his business were failing?

Can much credence be given to the evidence as to the spiritual and religious life of an absentee deacon of the church when it is so strongly asserted that he was guilty of the unpardonable sin of self-destruction?

And, what evidence is there in the record to justify the conclusion of suicide? His statement to his daughter that he was leaving, and his statement shortly before that time that he was going to hunt a job, and the statement that what he was going to do he hoped would be the best for all concerned, and his request to the bank to pay the premium on his insurance for another year, at the end of which he would either be better or dead, his ill health, despondency, and impecuniosity, his return of the Christmas gifts with the statement that he would not need them, are all the circumstances upon which a theory of suicide could be based.

Was his failure or refusal to tell his daughter what his plans were evidence of a suicidal intent any more than it was evidence of an absence of any definite plan, or of a secret purpose to absent himself from his financial and family responsibilities?

Was the shedding of a few tears and the statement, "I just hope what I am going to do is for the good of all the family," inconsistent with the statement previously made to the witness that he was planning to leave the business to find employment elsewhere?

Was the shedding of tears any more consistent with an intent to commit suicide than with a realization that he had not been of much help or honor to his family and that if he moved on into obscurity it might be best for all concerned?

Was his statement in the letter of December 18, 1928, requesting the bank to pay the premiums on his insurance, to the effect that he had been in bad health and unable to work but that he guessed he would either be all right or dead by the time another premium came due, consistent with the conduct of one who was contemplating suicide or of one who was planning to live?

If the insured had intended to destroy himself shortly before his insurance policies lapsed, would he have been concerned with the unnecessary payment of premiums?

Where a father had sent no Christmas gifts to his family, does the fact that he returns gifts to his daughter with the request that she give them to his sons, meanwhile asserting that he would not need the gifts, sustain the conclusion that he intended to take his own life any more than it justifies the conclusion that he was neither giving to, nor receiving from, his family anything further, and by this method was making a symbolic severance of relations preparatory to an intended desertion of that family?

The plaintiffs have relied wholly upon inferences which they draw from circumstantial evidence to prove death by suicide on the 29th day of December, 1928. There is no direct testimony of death at any time or in any manner. Since the opinion by Judge Sibley in the case of Mutual Life Ins. Co. of New York v. Zimmerman, supra, the Florida rule that circumstantial evidence relied upon in a civil case must not only be consistent with the theory that authorizes recovery but must fairly and reasonably exclude any other explanation of the facts, has been modified by King v. Weis-Patterson Lumber Co., 124 Fla. 272, 168 So. 858; Stigletts v. McDonald, 135 Fla. 385, 186 So. 233; and Fireman's Fund Indemnity Co. v. Perry, 149 Fla. 410, 5 So.2d 862, 863. In the last-cited case the Supreme Court of Florida said:

"In the case of Reed et vir. v. American Ins. Co. of Newark, New Jersey, 128 Fla. 549, 175 So. 224, 225, we stated the rule to be applied in testing the sufficiency of

**732**

circumstantial evidence in civil cases, as follows:

" 'In civil cases the preponderance of evidence required, where circumstantial evidence is relied on as the method of proof, is a preponderance of all reasonable inferences that might be drawn from the circumstances in evidence to prove the principal fact sought to be established sufficient to outweigh all other contrary inferences. King v. Weis-Patterson Lumber Co., 124 Fla. 272, 168 So. 858.'

"In Stigletts v. McDonald, 135 Fla. 385, 186 So. 233, 235, we said:

" 'Circumstantial evidence must as a general rule be of such a conclusive nature that it is not reasonably susceptible of two equally reasonable inferences.' "

█ It, therefore, is not the rule in Florida now that circumstantial evidence in a civil case must exclude every other reasonable hypothesis than the one proposed to be proven. It is sufficient now if the circumstantial evidence amounts to a preponderance of all reasonable inferences that can be drawn from the circumstances in evidence to the end that the evidence is not reasonably susceptible of two equally reasonable inferences.

Do the inferences which tend to support the theory of a prompt dissolution outweigh the inferences which support merely a disappearance? Does the presumption of death under the circumstances outweigh the presumption against suicide?

The numerous questions propounded in this opinion, meanwhile probing the facts, add up to the conclusion that this case is pre-eminently one for the jury.

█ Without doubt there is ample evidence to support the jury's finding that the presumption of death had been established. This having been done, it was necessary in the present case that the time of death be fixed by the jury at some time within the seven-year period. The fact of death as established by the presumption may be considered by the jury in fixing the time of death. 25 C.J.S., Death, § 10, p. 1069. In addition to the letters, statements, and the other circumstances mentioned above from which an inference of Hamilton's death at or about the time of his disappearance may be drawn, the jury was entitled to take into consideration the fact that for many months he had been in such failing health as to be unable to work and earn a livelihood, that he had no funds of consequence on which to live, and there is no showing that the charity of his friends or the forbearance of his creditors was such that one in his state of health could long subsist, which fact would render it not improbable that had he remained alive he would have, as had been his custom for some time theretofore, called upon his family, especially his old mother who had never failed him, for support. His death being presumptively established, it was the fitting function of the jury as the fact-finding body of the Court to consider all the facts and circumstances of this bizarre situation, weighing preponderances and balancing inferences and comparing presumptions, in the fixing of the date of Hamilton's death. It is not necessary that this Court concur in the facts as found by the jury, but merely to determine that a jury question was involved in a controversy of evidence, inferences, and presumptions as to the effect of which the minds of reasonable men might differ, and in the jury's solution of which we cannot say there was no substantial support.

█ The lower Court was without error in its ruling in the case of the Oakland Corporation. The acceptance of the cash surrender value of the policies by the liquidator of the Southern Bank and Trust Company and the surrender of the policies exhausted all rights of the bank under said policies, and the Oakland Corporation, as assignee, could, of course, acquire no rights which the bank had theretofore exercised and exhausted. The rulings of the lower Court in reference to interest and attorneys fees were likewise without error.

The case is affirmed not only as to the direct but as to the cross appeals.

Affirmed.

McCORD, Circuit Judge, concurs in the result.